other machines of the same kind in this factory, and in other factories, had the rollers covered or guarded, as tending to show that it was practicable to cover or guard these rollers. It was improper to show that other machines in this and in other factories were guarded, for it was entirely immaterial under the pleadings whether it was practicable to guard this machine or not. Leaving a pool of oil near an unguarded machine is just as negligent, whether it is practicable to guard the machine or not, for the negligence is not in leaving the machine unguarded, but in leaving the oil upon the floor where an employé is liable to slip and be thrown into the unguarded machine. This evidence as to the other machines brought into the case an issue not foreshadowed by the pleadings, and it is impossible to say whether the recovery was based upon negligence in allowing oil to drop upon the floor, or in leaving the rollers of the machine uncovered. The question was squarely raised upon the trial, and, if the plaintiff desired to rely upon a violation of the labor law, or negligence in leaving the rollers unguarded, he should have amended his complaint. At the close of the case the court informed the jury that they might take into consideration the fact that there was no cover upon the rollers, but not that it was a violation of the labor law. This did not cure the error. Irrespective of the labor law, the jury may have determined that it was negligence to put the plaintiff at work around an unguarded machine. Plaintiff suffered his serious injury by falling against the rollers while they were in motion, and the evidence was clearly prejudicial.

The judgment and order should therefore be reversed and a new trial granted, with costs to the appellant to abide the event. All concur.

---

WREN v. KENNEDY VALVE MFG. CO.

(Supreme Court, Appellate Division, Third Department. November 13, 1907.)

1. MASTER AND SERVANT—DEATH OF SERVANT—DEFECTIVE APPLIANCES.

In an action for death of plaintiff's intestate by the accidental tipping of a ladle containing molten metal in defendant's foundry, evidence *held* insufficient to support a finding of negligence on defendant's part in providing an alleged defective hook by which the ladle was attached to a crane.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 958.]

2. SAME—REPAIR AFTER ACCIDENT—EVIDENCE.

Where plaintiff's intestate was killed by the spilling of molten metal from a ladle in defendant's foundry, alleged to have been due to a defective bail, evidence that after the accident the bail was repaired could not be considered on the issue of defendant's negligence at the time of the accident.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 918.]

Appeal from Trial Term, Albany County.

Action by Margaret Purtel Wren, as administratrix, etc., of Thomas Wren, deceased, against the Kennedy Valve Manufacturing Company. From a judgment for plaintiff, and from an order denying defendant's

motion to set the verdict aside, it appeals. Reversed. New trial granted.

Argued before SMITH, P. J., and CHESTER, KELLOGG, COCHRANE, and SEWELL, JJ.

A. J. Nellis and John A. Delehanty, for appellant.

Mark Cohn and John W. Walsh, for respondent.

COCHRANE, J.   Plaintiff's decedent, Thomas Wren, died in consequence of being burned by molten iron while working for the defendant in its foundry at Coxsackie, N. Y., on the evening of December 19, 1900.   Negligence of the defendant in causing such injury is alleged as the reason why the judgment which plaintiff has recovered herein should be sustained.   The molten iron was poured into a cylindrical shaped ladle capable of holding about one ton, and this ladle, with its contents, was transported by means of a crane to different parts of the foundry where the molten iron was used by the various workmen.   On either side of the ladle, and extending outwardly therefrom, was a round projection called a "shank," about two inches in diameter.   When the ladle was filled and ready for transportation, both these shanks were grasped by hooks at the ends of an arched shaped bail, the center of which bail was attached to the crane.   These were ordinary hooks made by bending the bail at its extremities outward and upward, so that the hooks could be placed beneath the shanks of the ladle, and when the latter was lifted by the crane the shanks would rest securely in the curve of the hooks, if properly adjusted.   It was the duty of one of the workmen to adjust these hooks around the shanks of the ladle when the latter was filled with the molten metal.   At the time of the accident this adjustment had been supposedly made, and the ladle with its burden had been transported to another part of the foundry where the deceased was to receive it.   As the ladle reached its destination, it was discovered by one of the workmen that one of the shanks, instead of resting in the curve of the hook, rested on the end of its shorter side.   An alarm was given to lower the ladle, so that the proper adjustment could be made, but before this could be accomplished the ladle slipped from the hook, and its contents fell upon the deceased, causing the injuries which resulted in his death.

It is claimed that the hook was defective and unsafe because the end of the prong or side thereof on which the shank rested protruded or curved too much outwardly, so that there was a tendency for the shank to catch and rest thereon, instead of slipping into the bend or curve at the bottom of the hook.   This bail with the hooks in the same condition had been in frequent use for at least three years.   During that time no accident had occurred.

The respondent urges on our attention the case of Welle v. Celluloid Company, 175 N. Y. 401, 67 N. E. 609.   In that case the mechanism and the defect therein which was responsible for the accident were strikingly similar to that which existed here.   A judgment of nonsuit was affirmed by the Appellate Division.   It was held by a bare majority of the Court of Appeals that the case was a close one, but that

it should have been submitted to the jury. There was, however, an important distinction between that case and this, and on that distinction the opinion of the latter court seems to have turned as to the question of the defendant's negligence. In that case the form of the hook had been changed shortly before the accident, and the court said:

"No reason appears why the form of hook was changed. In making that change, the defendant was bound to use reasonable care to see that the new appliance was equally safe with the old, and the jury might have found that the master was chargeable with knowledge of the danger caused by the change which would not be imputed to a common laborer. It is in this respect that the present case is to be differentiated from that of Burke v. Witherbee, 98 N. Y. 562. There the appliance, the failure of which caused the accident, had worked safely for a long period, and there was no proof that the master should have known that in any way it was unsuitable for the purpose for which it was used. The proof here is to the contrary."

It will be observed that in the Welle Case it was stated that "the jury might have found that the master was chargeable with knowledge of the danger caused by the change which would not be imputed to a common laborer," and that seems to be the only circumstance, or at least the principal circumstance, on which it was held that negligence could be predicated. Here there had been no change in the bail or its hooks, and that circumstance does not exist. I think this case is differentiated from the Welle Case, and is controlled by the principles enunciated in Burke v. Witherbee, cited and distinguished in the Welle Case. In Burke v. Witherbee the accident also happened because of the slipping of an iron hook. The work would seem to have been just as dangerous as the work in defendant's foundry. The court said:

"The defendants did not owe the duty to their workmen to furnish the best known or the best conceivable appliances; but they were under a duty to furnish reasonably safe and suitable appliances, such as a prudent man would furnish if his own life were exposed to the danger that would result from unsuitable or defective appliances."

It is true that one witness testified that six or eight months before the accident the shank rested on the end of the outer side of the hook, but it was discovered, and the ladle lowered without accident. Another witness testified that on half a dozen different occasions, when he was adjusting the hooks to the shank, he discovered before the ladle was elevated that the shanks caught "on the point of the hook," as he expressed it. It is quite apparent, however, that this might have occurred if there had been no flare or protrusion at the end of the outer side. No matter what the details of the construction, unless care were used in the proper adjustment, the shank because of the pressure of the superimposed weight might have poised and balanced on the shorter side of the hook and subsequently slipped off. This latter witness also testified that the point of the hook projected forward, and had a flat spot on it presenting an inch and a half surface. It does not appear how long it had been in that condition. It may have been bent and flattened at the time of the accident by the weight which then rested upon it. It is quite strange that, if it had been in that condition, some of the workmen would not have observed it prior to the accident. Neither of these witnesses made any report or suggestion of danger to

the defendant or its superintendent. None of the workmen who operated these hooks and who must necessarily have been cognizant of their danger, if danger there was, made any suggestion of their inadequacy or insufficiency. The defendant operated a blacksmith shop in connection with its foundry, and, as the evidence shows, the hook might have been straightened without expense, trouble, or inconvenience. If the hook were unsafe, the lives of these witnesses were in jeopardy, and the best evidence that they did not believe it to be unsafe is the fact that as they say with knowledge of its condition they continued to operate it without complaint, although with no appreciable trouble or inconvenience it might have been changed. The only natural inference is that the hook itself was not suggestive of danger. In the Burke Case, as here, one or more witnesses testified to the prior slipping of the hook, and what was there said is peculiarly applicable to the present case:

"None of them [the workmen] ever complained of it as inadequate, and, as we must infer, none of them believed it to be so. They were just as capable to judge of its safety and adequacy as the defendants, and certainly would not have exposed their lives without some protest if they had supposed there was any danger from the use of the hook. No person was called as a witness who ever heard any complaint or allegation anywhere before this accident that the hook was an unsafe or insufficient implement. Under such circumstances can the defendants be charged with negligence? Were they bound to know more than every one else? Ought they to have perceived danger that was not visible to any one else, and which those whose lives were most exposed were not sufficiently wise or vigilant to foresee?"

The defendant in cross-examining plaintiff's witnesses proved that, after the accident, this bail was taken to defendant's blacksmith shop, and that both hooks were straightened, a fact which the plaintiff would not have been permitted to prove. This fact, however, although it doubtless influenced the jury, has no legitimate bearing on the case. The question of defendant's negligence must be judged with reference to the standpoint of the parties at the time of the accident, and not in the light of knowledge which almost always comes with the happening of an accident. See Corcoran v. Village of Peekskill, 108 N. Y. 151, 15 N. E. 309; Burke v. Witherbee, 98 N. Y. 568.

For the reason, therefore, that the evidence is insufficient to establish the negligence of the defendant, the judgment and order must be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.